## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

LEONTINE FOSTER, individually and on behalf of and all others similarly situated,

   Plaintiff,

   v.

PELICAN STATE CREDIT UNION,

   Defendant.

CIVIL ACTION

CASE NO.

COMPLAINT-CLASS ACTION

## CLASS ACTION COMPLAINT

Plaintiff, Leontine Foster, brings this Class Action Complaint against Defendant Pelican State Credit Union ("Defendant" or "Pelican"), and allege as follows:

### INTRODUCTION

1.     This is a civil action seeking monetary damages, restitution, injunctive, and declaratory relief from Pelican over the improper assessment and collection of $30 Overdraft Fees on transactions that did not actually overdraw the account.

2.     This practice breaches Pelican's contractual representations in its standardized "What You Need to Know About Overdrafts & Overdraft Fees" (the "Opt-In Form"), attached as Ex. A, and the "What Else You Should Know About Overdraft Privilege" document (the "Overdraft Disclosure"), attached as Ex. B (collectively, the "Contract").

3.     This practice also breaches Pelican's duty of good faith and fair dealing, unjustly enriches Pelican to the detriment of its customers, and violates Regulation E (12 C.F.R. § 1005.17 *et seq*.) of the Electronic Fund Transfers Act of the (15 U.S.C. § 1693 *et seq*.).

1

4.    Overdraft Fees are among the primary fee generators for banks. According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees.

5.    Unfortunately, the customers who are assessed these fees are the most vulnerable customers.  Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees. Overdrawn: Consumer Experiences with Overdraft, Pew Charitable Trusts 8 (June 2014), https://bit.ly/3ksKD0I.

6.    Pelican has made substantial revenue through the imposition of these fees, seeking to turn its customers' financial struggles into revenue.

7.    Plaintiff, like thousands of others, have fallen victim to Pelican's Overdraft Fee revenue maximization scheme.

## PARTIES

8.    Plaintiff Leontine Foster is a citizen and resident of Louisiana and has had a checking account with Pelican at all times material hereto.

9.    Defendant Pelican Bank is a Louisiana credit union with its headquarters and principal place of business located in Baton Rouge, Louisiana. Pelican has roughly $619 million in assets and provides banking services to thousands of customers through its branches in Louisiana. Among other things, Pelican is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative Class.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to the 28 U.S.C. § 1331 because Plaintiff alleges that Defendant violated the Electronic Fund Transfers Act (Regulation E), C.F.R. § 1005 *et seq.*  This Court also has jurisdiction of this action under the Class Action Fairness

Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and based upon information and belief, at least one member of the proposed Class is a citizen of a different state than Defendant.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

**BACKGROUND FACTS**

I.    **PELICAN ASSESSES OVERDRAFT FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS**

   **A. Overview of the Claim**

12.    Plaintiff brings this action challenging Pelican's practice of charging Overdraft Fees on what are referred to in this Complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

13.    Here's how the practice works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Pelican immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Pelican has already held the funds for payment.

14.    However, Pelican still assesses crippling $30 Overdraft Fees on many of these transactions and mispresents its practices in the Contract.

15.    Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Pelican later assesses Overdraft Fees on those same

transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

16.     Pelican maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Pelican holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the account holder and are specifically reserved for a given debit card transaction.

17.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

18.     That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for pending debit card transactions. Therefore, many subsequent transactions incur Overdraft Fees due to the unavailability of the funds held for earlier debit card transactions.

19.     Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Pelican improperly charges Overdraft Fees on APSN Transactions.

20.     The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.
>
> At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

21.     There is no justification for these practices other than to maximize Pelican's Overdraft Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. But Pelican is free to protect its interests and either reject those

intervening transactions or charge Overdraft Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.

22.    But Pelican was not content with these millions in Overdraft Fees. Instead, it sought millions more in Overdraft Fees on APSN Transactions.

23.    Besides being deceptive, this practice breaches contract promises made in Pelican's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of Pelican's processes and practices. Pelican also exploits its contractual discretion by implementing these practices to gouge its customers.

**B.  Mechanics of a Debit Card Transaction**

24.    A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Pelican. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to Pelican, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

25.    At this step, if the transaction is approved, Pelican immediately decrements the funds in a consumer's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

26.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

27.    Pelican (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Pelican may choose to either pay the transaction or to decline it. When the time comes

to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

28.     There is no change—no impact whatsoever—to the available funds in an account when this transfer occurs.

**C. Pelican's Contract**

29.     The Opt-In Form provides that "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." Ex. A (emphasis omitted).

30.     The Overdraft Disclosure provides explains that overdrafts are determined based on the account's "available balance": "Pelican State Credit Union authorizes and pays transactions using the Available Balance in your account." Ex. B at 2.

31.     The Contract reiterates this promise, stating: "You should assume that any item which would overdraw your account based on your Available Balance may create an overdraft." *Id.*

32.     The "available balance" is defined as the "Ledger Balance, less any holds due to pending debit card transactions and holds on deposited funds." *Id.*

33.     The Contract provides that holds "for any authorized debit card transaction [lasts] until the transaction settles (usually within two business days) or as permitted by payment system rules." *Id.*

34.     In breach of these promises, Pelican regularly charges Overdraft Fees on transactions when customers' accounts *do* have "enough money" or a sufficient "available

balance" because the funds required to settle the transaction were held in the account at authorization.

35.     Pelican further explicitly and repeatedly promises that overdrafts are determined if there is not "enough money" or a sufficient "available balance" at authorization":

> [W]e will not ***authorize*** debit card transactions unless your account's Available Balance (including Overdraft Coverage Options) is sufficient to cover the transactions and any fee(s).

> Giving us your consent to ***authorize*** everyday debit card overdrafts on your consumer account . . . may result in you incurring Overdraft Fees . . . . However, this would allow us to ***authorize*** transactions up to the amount of your Overdraft Privilege limit.

> . . .

> The balance used for ***authorizing*** everyday debit card transactions on accounts with Standard Coverage is your Available Balance plus any available Overdraft Protection but does NOT include the Overdraft Privilege limit.

> The balance used for authorizing everyday debit card transactions on accounts with Extended Coverage is your Available Balance plus any available Overdraft Protection and includes the Overdraft Privilege limit.

*Id.* at 1, 2 (emphases added).

36.     Moreover, the Contract repeatedly states that, for point-of-sale transactions, authorization and payment occur simultaneously:

> Pelican State Credit Union ***authorizes and pays*** transactions using the Available Balance in your account.

*Id.* (emphasis added)

> **What are the standard overdraft practices that may come with my account?**
> - We <u>do</u> ***authorize and pay*** overdrafts for the following types of transactions:
>   - Checks and other transactions made using your checking account number
>   - Automatic bill payments
> - We <u>do</u> not ***authorize and pay*** overdrafts for the following types of transactions, unless you ask us to (see below):
>   - Everyday debit card transactions

- We pay overdrafts at our discretion, which means we <u>do not guarantee</u> we will always ***authorize and pay*** any type of transaction.
- If we <u>do not</u> ***authorize and pay*** an overdraft, your transaction will be declined.

. . .

**What if I want Pelican State CU to *authorize and pay* overdrafts on my everyday debit card transactions?**
If you want us to ***authorize and pay*** overdrafts on everyday debit card transactions, you may extend coverage by:
- Calling us at 1-800-351-4877
- Visiting pelicanstatecu.com
- Completing the form below

Ex. A (bolded italics added).

37.    In total, the Contract links "authorization" to "payment" for overdraft purposes ***nine times***.

38.    Pelican thus links payment of debit card transactions to authorization, meaning the transactions are paid, and therefore overdrafts are determined, at authorization.

39.    Pelican also links its overdraft determination to the time it exercises its discretion to pay or return an item that is presented to it, explaining: "We pay overdrafts at our discretion, which means we do not guarantee we will always authorize and pay any type of transaction. If we do not authorize and pay an overdraft, your transaction will be declined." *Id.*

40.    The Overdraft Disclosure reinforces this promise, stating: "Overdraft Privilege is not a line of credit; it is a discretionary overdraft service that can be withdrawn at any time without prior notice."

41.    Pelican's decision to cover, pay, or authorize and pay a transaction necessarily occurs at the moment of authorization. Once a transaction is authorized, Pelican has no discretion and is "obligated to pay" the charge. *See* 74 Fed. Reg. 59033-01, 59046.

42.    Taken together, these promises mean that Pelican will decide whether a transaction is an "overdraft"—and therefore whether the transaction will be charged an Overdraft Fee—at the time it authorizes the transaction and places a hold on the funds required to pay it.

43.    For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always sufficient funds to cover those transactions—yet Pelican assesses Overdraft Fees on them anyway.

44.    The above promises indicate that transactions are only overdraft transactions when they are authorized and approved into a negative account balance. Of course, that is not true for APSN Transactions.

45.    In fact, Pelican actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions.

46.    All of the above representations and contractual promises are untrue. Pelican charges fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Pelican may impose fees on any APSN Transactions.

47.    The Contract also misconstrues Pelican's true debit card processing and overdraft practices.

48.    First, and most fundamentally, Pelican charges Overdraft Fees on debit card transactions for which there are sufficient funds available to cover throughout their lifecycle.

49.    Pelican's practice of charging Overdraft Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so. This discrepancy between Pelican's actual practice and the Contract causes consumers like Plaintiff to incur more Overdraft Fees than they should.

10

50.     Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

51.     Because these withdrawals take place upon initiation, the funds cannot be re-debited later.

52.     Therefore, at the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds. As such, Pelican cannot then charge an Overdraft Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

53.     In sum, there is a huge gap between Pelican's practices as described in the Contract and Pelican's actual practices.

54.     Banks and credit unions like Pelican that employ this abusive practice require their accountholders to expressly agree to it—something Pelican here never did.

55.     Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed Overdraft Fees on APSN Transactions.

56.     For example, Bank of America's deposit agreement states:

Debit card transactions and related authorization holds may impact your available balance. It is important to know that your available funds may change between the time you authorize a transaction and when the transaction is paid. . . . **The amount being held is not applied to the debit card transaction**. . . . **If other account activity has caused the funds available in your account to drop below zero before the debit card transaction is paid, you may no longer have sufficient funds to pay the merchant**. . . .

Here is an example of how that may happen: On Monday we authorize a debit card transaction because you have enough available funds at the time. A hold is then placed on your funds until the merchant presents the transaction for payment. On Tuesday we process and post another transaction (such as a check you wrote) that

> reduces your available funds below zero. If the merchant presents the original debit card transaction for payment on Wednesday, and your available funds are now below the amount needed to pay the transactions, the debit card transaction will overdraw your account and you may incur an overdraft fee.

*Deposit Agreement and Disclosure*, Bank of America 19 (Nov. 12, 2021), https://bit.ly/38iRk1G

(emphasis added).

57.     Pelican and its accountholders make no such agreement. The Contract thus misleads and deceives account holders.

### D.  Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately

58.     Pelican's assessment of Overdraft Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

59.     Pelican was and is aware that this is precisely how its accountholders reasonably understand debit card transactions work.

60.     Pelican knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they don't allow debt like credit cards as the money comes directly out of the checking account.

61.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the

one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, ConsumerAction (Jan. 14, 2019), https://bit.ly/3v5YL62.

62.    This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

63.    Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

64.    Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: How Overdraft Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.

65.    In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



**Figure 3: Top Overdraft Consumer Complaint Issues, by Percentage of Total Complaints**

*Id.*

66.    Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id.* at 9.

67.    Ultimately, unclear and misleading fee representations like those in Pelican's account documents mean that consumers like Plaintiff "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." *Id.*

68.    The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this wide-spread confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not

incur an overdraft fee, even if the transaction later settles against a negative available balance."
*Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

69.     Despite this recommendation, Pelican continues to assess Overdraft Fees on transactions that are authorized on sufficient funds.

70.     Pelican was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Contract only supports this perception.

71.     Pelican was also aware of consumers' confusion regarding Overdraft Fees but Pelican nevertheless failed to make its members agree to these fee practices.

**E.  Plaintiff Was Assessed Overdraft Fees on Debit Card Transactions Previously Authorized on Sufficient Funds**

72.     Plaintiff was assessed Overdraft Fees on debit card transactions that were previously authorized on sufficient funds on multiple occasions.

73.     For example, on August 16, 2021, Plaintiff was assessed a $30 Overdraft Fee on a debit card transaction that had been authorized on sufficient funds on August 14, 2021.

74.     Contrary to Pelican's Contract, the Overdraft Fee was charged even though (1) Plaintiff's account had "enough money" or a sufficient "available balance," at the time the transaction was "authorized and paid," and (2) Pelican set aside sufficient funds to cover those transactions.

75.     The improper fees charged by Pelican were not "errors" by Pelican, but rather were intentional charges made by Pelican as part of its standard processing of transactions.

76.     Plaintiff therefore had no duty to report the fees as "errors" because they were not "errors," but were part of the systematic and intentional assessment of fees according to Pelican standard practices.

77.     Moreover, any such reporting would have been futile as Pelican's own contract admits that Pelican made a decision to charge the fees.

## II.     THE IMPOSITION OF OVERDRAFT FEES THAT DO NOT OVERDRAW THE ACCOUNT BREACHES PELICAN'S DUTY OF GOOD FAITH AND FAIR DEALING

78.     Parties to a contract are required not only to adhere to the express terms of the contract but also to act in good faith when they are invested with a discretionary power over the other party. This creates an implied duty to act in accordance with account holders' reasonable expectations and means that the bank or credit union is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the bank or credit union has a duty to honor transaction requests in a way that is fair to its customers and is prohibited from exercising its discretion to pile on even greater penalties on its account holders.

79.     Here—in the adhesion agreements Pelican foisted on Plaintiff and its other customers—Pelican has provided itself numerous discretionary powers affecting customers' accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Pelican abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged Overdraft Fees on transactions that do not actually overdraw the account.

80.     Pelican exercises its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it assesses fees in this manner. Pelican also abuses the power it has over customers and their accounts and acts contrary to their reasonable expectations under the Contract. This is a breach of Pelican's implied covenant to engage in fair dealing and to act in good faith.

81.    It was bad faith and totally outside Plaintiff's reasonable expectations for Pelican to use its discretion in this way.

82.    When Pelican charges improper fees in this way, Pelican uses its discretion to define the meaning of key terms in an unreasonable way that violates common sense and reasonable consumers' expectations. Pelican uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more Overdraft Fees.

## CLASS ALLEGATIONS

83.    Plaintiff brings this action individually and as a class action on behalf of herself and the following proposed Class (the "Class"):

> All persons who are checking account holders at Pelican Bank and who were assessed overdraft fees on debit card transactions authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized and before the authorization hold expired.

Plaintiff reserves the right to modify or amend the definition of the Class as this litigation proceeds.

84.    Excluded from the Class are Pelican, its parents, subsidiaries, affiliates, officers and directors, any entity in which Pelican has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

85.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

86.    The Class consists of thousands of members, such that joinder of all Class members is impracticable.

87.    There are questions of law and fact that are common to all members of the Class that relate to Pelican's practice of charging improper Overdraft Fees.

88.     The claims of Plaintiff are typical of the claims of the proposed Class because they are based on the same legal theories, and Plaintiff has no interests that are antagonistic to the interests of the members of the Class.

89.     Plaintiff is an adequate representative of the Class and has retained competent legal counsel experienced in class actions and complex litigation.

90.     The questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, particularly because the focus of the litigation will be on Pelican's conduct. The predominant questions of law and fact in this litigation include, but are not limited to, whether Pelican:

- Imposed Overdraft Fees on transactions that were authorized on sufficient funds;

- Breached its contract with Plaintiff and members of the Class;

- Breached the covenant of good faith and fair dealing imposed on it;

- Was unjustly enriched when it collected these improper fees; and

- Violated Regulation E of the Electronic Fund Transfers Act.

91.     Other questions of law and fact common to the Class include the proper method or methods by which to measure damages.

92.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of hundreds of individual lawsuits would not be economically feasible for individual members of the Class, and certification as a class action will preserve judicial resources by allowing the common issues of the members of the Class to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Pelican, no Class member could afford to seek legal redress individually for the claims

alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Pelican's misconduct will proceed without remedy. In addition, without a class action, it is likely that many members of the Class will remain unaware of Pelican's conduct and the claims they may possess.

93.    It appears that other persons who fall within the definition of the Class set forth above are not pursuing similar litigation, such that individual Class members do not wish to control the prosecution of separate actions.

94.    This proposed class action does not present any unique management difficulties.

**COUNT ONE**
**Breach of Contract, Including Breach of the**
**Implied Covenant of Good Faith and Fair Dealing**
(*On behalf of Plaintiff and the Class*)

95.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth below.

96.    Plaintiff and Pelican have contracted for bank account deposit, checking, and debit card services. *See* Exs. A-B.

97.    Similarly, all members of the Class have contracted with Pelican for bank account deposit, checking, and debit card services. *Id.*

98.    All of Pelican's account holders, including Plaintiff and the members of the Class, are subject to the Contract.

99.    Pelican misconstrued in the Contract its true Overdraft Fee practices and breached the express terms of the Contract.

100.    No contract provision authorizes Pelican to charge Overdraft Fees on transactions that did not overdraw checking accounts or on debit card transactions authorized on sufficient funds.

101.    Pelican breached the terms of the Contract by charging Overdraft Fees on transactions that did not overdraw checking accounts and on debit card transactions authorized on sufficient funds.

102.    Louisiana imposes a duty of good faith and fair dealing on contracts between banks and their customers because banks are inherently in a superior position to their checking account holders because, from a superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

103.    Pelican abuses its discretion in its own favor—and to the prejudice of Plaintiff and other customers by charging Overdraft Fees on transactions that did not overdraw checking accounts and on debit card transactions authorized on sufficient funds. This is an abuse of the power that Pelican has over Plaintiff and their bank account, is contrary to Plaintiff's reasonable expectations under the Contract, and breaches Pelican's implied covenant to engage in fair dealing and to act in good faith.

104.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

105.    Pelican has breached the covenant of good faith and fair dealing in the contract through its policies and practices as alleged herein.

106.    Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the Contract.

107.    Plaintiff and members of the Class have sustained damages because of Pelican's breach of the Contract.

108.    Plaintiff and members of the Class have sustained damages because of Pelican's breach of the covenant of good faith and fair dealing.

## COUNT TWO
**Violation of Electronic Fund Transfer Act (Regulation E), C.F.R. § 1005 *et seq*.**
**(Authority Derived From 15 U.S.C. § 1693 e*t seq*.)**
**(*On behalf of Plaintiff and the Class*)**

109.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth below.

110.    By charging overdraft fees on transactions that did not actually overdraw the account and on debit card transactions that were authorized on positive funds, Defendant violated Regulation E (12 C.F.R. § 1005 *et seq*.), the "primary objective" of which is "the protection of individual consumers" and which "carries out the purposes of the Electronic Fund Transfer Act," 12 C.F.R. § 1005.l(b), the "primary objective" of which is also "the provision of individual consumer rights," 15 U.S.C. § 1693(b).

111.    Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E. The Opt In Rule states: "a financial institution . . . shall not assess a fee or charge . . . pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice]. . . describing the institution's overdraft service" and (ii) "[p]rovides a reasonable opportunity for the consumer to affirmatively consent" to enter into the overdraft program. 12 C.F.R. § 1005.17. The notice "shall be clear and readily understandable."  12 C.F.R. §205.4(a)(l). To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its

21

customers a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

112.    The intent and purpose of this Opt-In Form is to "assist customers in understanding how overdraft services provided by their institutions operate . . . . by explaining the institution's overdraft service . . . in a clear and readily understandable way"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 5940, 5948, which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA), N.A.*, 179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z)).

113.    Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Defendant's opt-in method fails to satisfy 12 C.F.R. § 1005.17 because it misrepresents Defendant's overdraft practices, as discussed above.

114.    As a result of failing to provide accurate disclosures as required by Regulation E, Defendant has harmed Plaintiff and the Class.

115.    Due to Defendant's violation of Regulation E, 12 C.F.R. § 1005.17, Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C. § 1693m.

## COUNT THREE: UNJUST ENRICHMENT
### (*On behalf of Plaintiff and the Class*)

116.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth below.

117.    Plaintiff, individually and on behalf of the Class, asserts a common law claim for unjust enrichment. This claim is brought solely in the alternative to Plaintiff's breach of contract claims and applies only if the parties' contracts are deemed unconscionable or otherwise unenforceable for any reason. In such circumstances, unjust enrichment will dictate that Pelican disgorge all improperly assessed Overdraft Fees.

118.    Plaintiff and members of the Class conferred a benefit on Pelican at the expense of Plaintiff and members of the Class when they paid improper Overdraft Fees.

119.    Pelican appreciated this benefit in the form of the substantial revenue that Pelican generates from the imposition of such fees.

120.    Pelican has accepted and retained such fees under inequitable and unjust circumstances.

121.    Pelican should not be allowed to profit or enrich itself inequitably and unjustly at the expense of Plaintiff and the members of the Class and should be required to make restitution to Plaintiff and members of the Class.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff and members of the Class demand a jury trial on all claims so triable and judgment as follows:

A.    Certification for this matter to proceed as a class action under action under Federal Rule of Civil Procedure 23;

B.    Designation of Plaintiff as Class Representatives, and designation of the undersigned as Class Counsel;

C.    Restitution of all improper Overdraft Fees paid to Pelican by Plaintiff and the Class because of the wrongs alleged herein in an amount to be determined at trial;

D.    Actual damages in an amount according to proof;

E.    Declaring Pelican's fee policies and practices alleged in this Complaint to be wrongful and unconscionable to the extent they are inconsistent with Pelican's contractual representations;

F.    Enjoining Pelican from engaging in the practices outlined herein to the extent they are inconsistent with Pelican's contractual representations;

G.    Pre- and post- judgment interest at the maximum rate permitted by applicable law;

H.    Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law;

I.    Attorneys' fees under the common fund doctrine and all other applicable law;

J.    Such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff, by counsel, demand a trial by jury.

Dated:   June 6, 2022                    Respectfully submitted,

                                         MCMICHAEL & CARTER, L.L.C.

                                         BY: /s/James C. McMichael, Jr.
                                         James C. McMichael, Jr. La. Bar No. 10443
                                         Mark Edward Carter, La. Bar No. 32278
                                         670 Albemarle Drive, Suite 302
                                         Shreveport, LA 71106
                                         Telephone: (318) 221-1004
                                         Facsimile: (318) 221-0008

                                         Lynn A. Toops*
                                         COHEN AND MALAD, LLP
                                         One Indiana Square, Suite 1400
                                         Indianapolis, IN 46204
                                         Phone: (317) 636-6481
                                         ltoops@cohenandmalad.com

Jeffrey Kaliel*
Sophia Gold*
KALIELGOLD PLLC
1100 15th Street NW 4th Floor
Washington, D.C. 20005
Telephone: (202) 320-4783
jkaliel@kalielpllc.com
sgold@kalielgold.com


\* To seek admission *pro hac vice*

**Counsel for Plaintiff and the Proposed Plaintiff Class**