# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**LEONTINE FOSTER, individually and on behalf of all others similarly situated**

**v.**

**PELICAN STATE CREDIT UNION**

**CIVIL ACTION**

**NO. 22-368-JWD-RLB**

## RULING AND ORDER

This matter comes before the Court on the *Motion to Dismiss*, (Doc. 40), filed by PELICAN STATE CREDIT UNION ("Defendant"). Plaintiff LEONTINE FOSTER ("Plaintiff" or "Foster") opposes the motion, (Doc. 44). Defendant has filed a reply, (Doc. 50). Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. The *Motion* is granted with respect to the breach of contract and unjust enrichment claims, and these claims are dismissed. However, dismissal will be without prejudice, and Plaintiff will be given leave to amend to cure those deficiencies. In all other respects, specifically as to the Regulation E claim and Defendant's argument about preemption, the *Motion* is denied.

## I.    RELEVANT FACTUAL BACKGROUND

The following factual allegations are primarily taken from Plaintiff's *Amended Class Action Complaint* ("*Complaint*"), (Doc. 27). The well-pled allegations are assumed to be true for purposes of this motion. *In re Great Lakes Dredge & Dock. Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)).

Plaintiff is a Louisiana domiciliary who entered into an agreement with Defendant "for bank account deposit, checking, and debit card services." (Doc. 27 at 2, 20.) Defendant is a Louisiana credit union with branches in Louisiana. (*Id.* at 2.) Plaintiff signed the "contract" which

includes the "Membership and Account Agreement" (Doc. 30-1) ("Membership Agreement"), "What You Need to Know about Overdrafts & Overdraft Fees" (Doc. 30-2) ("Opt-In form"), and "What Else You Should Know About Overdraft Privilege" (Doc. 30-3) ("Overdraft Disclosure"). (Doc. 27 at 1.) Prior to signing the contract, Plaintiff signed "prior materially similar contracts." (*Id.*)

During the time that Plaintiff had a bank account with Defendant, before November 1, 2021, Plaintiff had multiple transactions that were authorized on a positive available balance but were settled with a negative available balance. (*Id.* at 7.) Plaintiff was assessed an overdraft fee for each of these instances. (*Id.*) Plaintiff claims that these transactions, "Authorize Positive, Settle Negative" transactions, were assessed overdraft fees in breach of her contract with Defendant. (*Id.* at 7–8.) Plaintiff is bringing suit on her own behalf and as a class action on behalf of those similarly situated individuals who held accounts with Defendant between June 6, 2012, and October 31, 2021, and were assessed similar fees. (*Id.* at 17–18.)

 The Membership Agreement attached to the *Complaint* defines the terms "available balance" and "actual balance." (Doc. 30-1 at 4.)

> Your actual balance reflects the full amount of all deposits to your account as well as payment transactions that have been posted to your account. . . . Your available balance is the amount of money in your account that is available for you to use. Your available balance is your actual balance less: (1) holds placed on deposits; (2) holds on debit card or other transactions that have been authorized but are not yet posted; and (3) any other holds, such as holds related to pledges of account funds and minimum balance requirements to comply with court orders.

(*Id.*)

According to the Membership Agreement, the determination of whether there are sufficient funds in an account is based on the available balance. (*Id.*) Plaintiff pleads that the contract indicates that this determination is made at the time of authorization, which is when the account

holder swipes their card. (Doc. 27 at 8–10.) Plaintiff alleges that Defendant made determinations of overdraft fees at the time of settlement in violation of the contract. (*Id.* at 8.) Plaintiff makes a claim for the breach of the implied covenant of good faith and fair dealing, stemming from Defendant's actions in breach of the contract. (*Id.* at 20–21.)

Plaintiff also alleges that Defendant violated 12 C.F.R. § 1005 ("Regulation E") by not accurately describing its overdraft practices. (*Id.* at 22–23.) Finally, Plaintiff pleads an unjust enrichment claim. (*Id.* at 23–24.) Plaintiff asserts this in the alternative and only if the Court determines that the contract is unconscionable or unenforceable. (*Id.*) Further, Plaintiff alleges that Defendant benefitted from misrepresenting its overdraft fee practices to the detriment of Plaintiff and other class members. (*Id.* at 24.)

## II.    RULE 12(B)(6) STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Hamilton v. Dall. Cnty.*, No. 21-10133, 2023 WL 5316716, at *3 (5th Cir. Aug. 18, 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

"To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.' " *In re Great Lakes Dredge*, 624 F.3d at 210 (quoting *Twombly*, 550 U.S. at 555). "In deciding whether the complaint states a valid claim for relief, we accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *Id.* (citing *Doe*, 528 F.3d at 418). The Court does "not accept as true 'conclusory allegations,

3

unwarranted factual inferences, or legal conclusions.' " *Id.* (quoting *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007)).  "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.' " *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (citing *Iqbal*, 556 U.S. at 679).

The Court's "task, then, is 'to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.' " *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir.2010) (citing *Iqbal*, 556 U.S. at 678)).  "[A] claim is plausible if it is supported by 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct].' " *Calhoun v. City of Hous. Police Dep't*, 855 F. App'x 917, 919–20 (5th Cir. 2021) (per curiam) (quoting *Twombly*, 550 U.S. at 556).

Additionally, "[i]n determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (citations omitted).  "Although a 'court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims,' . . . the court need not do so." *Brackens v. Stericycle, Inc.*, 829 F. App'x 17, 23 (5th Cir. 2020) (per curiam) (quoting *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014)). *See also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) ("using

permissive language regarding a court's ability to rely on documents incorporated into the complaint by reference").

**III.    DISCUSSION**

In sum, the Court will grant Defendant's *Motion to Dismiss* in part and deny in part. First, Plaintiff's state law claims are not preempted by federal law because Plaintiff's claims are not challenging Defendant's overdraft disclosure practices. Thus, in this respect, Defendant's *Motion* is denied. Second, the breach of contract claim fails because, under Louisiana contract law, the three documents that make up the contract between Plaintiff and Defendant may be read together. The terms of the contract, when read as a whole, create no ambiguity and accurately reflect the overdraft practices that Plaintiff claims Defendant employs. There can be no breach of the implied duty of good faith and fair dealing when there is no underlying breach of contract. Thus, in this respect, Defendant's *Motion* is granted. Third, Plaintiff's unjust enrichment claim fails because there is a valid contract between the parties, which creates a remedy at law, precluding an unjust enrichment claim under Louisiana law. Thus, in this respect, Defendant's *Motion* is granted.

Finally, the Regulation E claim survives the *Motion* because an Opt-In form must be read segregated from all other information, and Plaintiff pled enough facts to give rise to the inference that there was a Regulation E violation. Defendant is not covered by the safe harbor provision of Regulation E, as Plaintiff is not challenging the form in which the disclosures were made. Thus, in this respect, Defendant's *Motion* is denied.

### A. Federal Preemption

#### 1. Parties' Arguments

##### a.   Defendant's Memorandum in Support (Doc. 40-1)

Defendant asserts that Plaintiff's state law claims are preempted by federal statute. (Doc. 40-1 at 27.) Defendant claims that this case is essentially a challenge of Defendant's disclosure of its practices, which interferes with the "exercise of its powers as a credit union under the Truth in Savings Act ("TISA"), and other implementing regulations." (*Id.*) Defendant claims that TISA preempts the application of state law that would prevent a credit union from exercising its powers. (*Id.*)

Defendant argues that Plaintiff has disguised her claim as one for breach of contract, and the allegations set forth in the *Complaint* relate to disclosure. (*Id.* at 28.) To support this, Defendant points to the portion of the *Complaint* where Plaintiff cites another bank's overdraft disclosure about the same practices. (*Id.*)

##### b.   Plaintiff's Opposition (Doc. 44)

Plaintiff responds by arguing that the claim is not preempted because not all state law claims interfere with a financial institution's ability to exercise its powers. (Doc. 44 at 28.) She says that state law is only preempted when it "inhibits 'credit union members and potential members[' ability] [sic] to make informed decisions' or 'meaningful comparisons among credit unions and depository institutions.' " (*Id.* at 29 (quoting 12 C.F.R. 707.1(b)).) Plaintiff says that the breach of contract law that she is seeking to enforce is in the spirit of this provision, seeking to enforce a contract where Defendant's actions inhibited its members' ability to make informed decisions. (*Id.*)

### 2.  *Law and Analysis*

The Truth in Savings Act requires that credit unions covered by it disclose their practices in order to allow members to make informed decisions. 12 C.F.R. § 707.1(b). As a federally insured credit union, Defendant is subject to the regulations set forth in TISA. *Id.* § 707.1(c). "State law requirements that are inconsistent with the requirements of TISA and this part are preempted to the extent of the inconsistency." *Id.* § 707.1(d). The Supremacy Clause of the United States Constitution provides that federal law preempts state law when the two conflict. U.S. Const. art. VI, cl. 2.

In *Gutierrez v. Wells Fargo Bank, NA*, the Ninth Circuit said that "[i]mposing liability for the bank's failure to sufficiently disclose its posting method leads to the same result as mandating specific disclosures." 704 F.3d 712, 726 (9th Cir. 2012). While the Ninth Circuit was referring to 12 C.F.R. § 7.4007(b)(3), which allows national banks to disregard state law disclosure requirements, the reasoning is similar here. TISA preempts state law where it is inconsistent with TISA requirements. 12 C.F.R. § 707.1(d). An interpretation of state law that would require Defendant to disclose more or different information than TISA requires, or that declared the fee practices unfair, would be preempted as being inconsistent with TISA. *Lambert v. Navy Federal Credit Union*, No. 19-103, 2019 WL 3843064 at *2 (E.D. Va. Aug. 14, 2019).

However, the Court finds that Plaintiff's claim is not seeking to require more disclosure of Defendant's practices. Instead, Plaintiff is trying to enforce the contract terms that it says indicate that "Authorize Positive, Settle Negative" transactions are not subject to overdraft fees. Although Plaintiff discusses the fairness of overdraft fees on "Authorize Positive, Settle Negative" transactions in her *Complaint*, the Court will only address the claims related to the enforcement of

the contract and the Regulation E claim, as any challenge of the overdraft disclosure practices themselves are preempted.

### B. Breach of Contract Claim

#### 1. *Parties' Arguments*

##### a. Defendant's Memorandum in Support (Doc. 40-1)

Defendant begins its *Memorandum in Support* by explaining how this suit is one of many that are pending before Louisiana state and federal courts that deal with overdraft fee practices. (Doc. 40-1 at 5.) Defendant asserts that it did not violate the agreement that it made with Plaintiff because it followed the disclosed fee practices. (*Id.*)

Defendant explains the difference between "actual balance" and "available balance" by citing provisions from the Membership Agreement. (*Id.* at 8 (citing Doc. 30-1 at 4).) It reiterates that the available balance is used when making the determination of whether to assess overdraft fees. (*Id.* at 9 (citing Doc. 30-1 at 4).) It says that "swipe debit card transactions take place in at least two steps." (*Id.*) The first step is when the card holder swipes their debit card, and the credit union pre-authorizes the transaction. (*Id.*) The pre-authorization results in a hold on the funds until " 'the authorization is completed.' " (*Id.* at 10 (quoting Doc. 30-1 at 4).) This hold is reflected in the available balance but does not decrease the actual balance of the account. (*Id.* (quoting Doc. 30-1 at 4).) Subsequently, the merchant submits a request for the funds, and the credit union takes the funds out of the account. (*Id.*) Defendant contends that the money does not leave the account until the merchant requests it. (*Id.* at 10–11.)

Defendant states that transactions that occur between the pre-authorization and the posting of the payment can decrease the available balance and cause the account to be in overdraft at the posting stage. (*Id.* at 11.) It argues that the Membership Agreement provides that the overdraft fee

is assessed at the posting of the transaction, not the pre-authorization. (*Id.* (quoting Doc. 30-1 at 4).)

Defendant points to the Overdraft Disclosure that was included with the Membership Agreement that further explains its overdraft policy. (*Id.* at 12.) The language in the Overdraft Disclosure explains that overdraft fees may be assessed when an account holder's " 'balance may appear to cover a transaction but later upon settlement it may not be sufficient to cover a transaction. In such cases, the transaction may further overdraw your account and be subject to additional fees.' " (*Id.* (quoting Doc. 30-3 at 2).) The Overdraft Disclosure further describes the process of posting a transaction to an account: " 'When the hold ends, the funds will be added to the Available Balance in your account. If your account is overdrawn after the held funds are added to the available balance and the transaction is posted to the available balance, an Overdraft Fee may be assessed.' " (*Id.* (quoting Doc. 30-3 at 2).) Defendant argues that "this provision clearly and unambiguously states that when the hold comes off and the transaction is finally posted, if the account is then overdrawn, an 'overdraft fee may be assessed.' " (*Id.* (quoting Doc. 30-3 at 2).)

Defendant asserts that Plaintiff has failed to state a claim because the plain meaning of the Membership Agreement clearly explains Defendant's overdraft practices, where the overdraft fee is assessed at the time the merchant requests payment. (*Id.* at 16.) It explains that financial institutions cannot assess overdraft fees at authorization because the amount that is submitted for pre-authorization is not always the final transaction amount. (*Id.* at 18.)

Defendant cites a Colorado federal district court case that found that the "authorize and pay" language in a contract, which is substantively similar to the language of the contract at hand, meant that authorization and payment happened at two distinct times, with an overdraft occurring at the time of payment. (*Id.* (citing *McCollam v. Sunflower Bank, N.A.*, 598 F. Supp. 3d 1104 (D.

Colo. 2022)).) Defendant cites several more federal district court rulings that held that overdraft fees are assessed at the time of settlement or payment, not pre-authorization. (*Id.* at 19.)

Defendant argues that if this Court were to interpret "pay and authorize" to mean the same point in time, it would violate Louisiana rules on contract interpretation. (*Id.*) There are provisions in the Membership Agreement that indicate that there is a passage of time between pre-authorization and the payment to a merchant. (*Id.* at 19–20.)

Defendant disputes Plaintiff's claim that held funds are set aside specifically for the purpose of fulfilling that transaction by saying that nothing in the Membership Agreement indicates that held funds may not be used for another purpose. (*Id.* at 12–13.) Defendant argues that because settlement involves posting the hold back to the available balance before paying the merchant, the funds are not necessarily held by the bank for the purpose of paying that transaction. (*Id.* at 20.)

Defendant claims that because Plaintiff's breach of contract claim fails, her breach of the covenant of good faith must fail as well. (*Id.* at 22–23 (citing *Favrot v. Favrot*, 2010-0986 (La. App. 4th Cir. 2011); 68 So. 3d 1099, 1109).)  It argues that since it exercised its rights that were explained in the Membership Agreement, there was no breach. (*Id.* at 23.)

b.  Plaintiff's Opposition (Doc. 44)

Plaintiff begins her *Opposition* by asserting that federal courts around the country have consistently denied motions to dismiss that are substantively identical to this case. (Doc. 44 at 7.) She cites to several federal and state trial level courts that have declined to dismiss cases similar to this one. (*Id.* at 7–8.) Plaintiff claims that the overdraft practice that Defendant employs is deceptive and in violation of federal law. (*Id.* at 8.)

Plaintiff argues that Defendant has the burden of showing that the language in the contract is clear and unambiguous and has not done so. (*Id.* at 9–10.) She addresses language pointed to by Defendant in its *Motion to Dismiss* regarding payments that are authorized while the available balance is positive but are settled into a negative balance. (*Id.* at 10–11.) Plaintiff claims that because this provision says that these payments will "further overdraw" the available balance, it is implied that only payments that previously overdrew the account will be assessed an overdraft fee. (*Id.* at 11.) Plaintiff further maintains that the practice of adding the held funds back to the available balance before paying the merchant only refers to transactions where the pre-authorization amount is different than the settlement amount. (*Id.*) Plaintiff asserts that the general understanding of consumers is that the holds are in place until settlement. (*Id.*)

Next, Plaintiff claims that the terms of the contract require Defendant to address overdrafts at the time of authorization and asserts that this is supported by the fact that the contract "links overdrafts to authorization at least six times." (*Id.* at 11–12.) Plaintiff also argues that authorization is linked to the payment of transactions; thus, overdrafts are linked to authorization. (*Id.* at 12.) She points the Court to eight times that the Opt-In form uses the phrase "authorize and pay." (*Id.* at 12–13.) She claims that because the two words are seen together in this way, reasonable people would understand that the credit union pays transactions at authorization. Plaintiff points to several state and federal courts that found that "authorize and pay" language meant that overdraft fees were assessed at authorization. (*Id.* at 13–14.) She argues that since her transactions were authorized when her available balance was positive, the overdraft fees should not have been charged. (*Id.* 14.)

Plaintiff further supports her position by arguing that Defendant decides whether to pay the transaction at the time of authorization, not settlement. (*Id.*) Plaintiff claims that since

Defendant reserves the discretion of whether to pay a transaction that will result in an overdraft, and financial institutions are required "to settle previously authorized transactions, regardless of other account activity," Defendant necessarily determines overdrafts at authorization, not payment. (*Id.* (citing 74 Fed. Reg. 59033-01, 59046).)

Plaintiff argues that, because the contract indicates that Defendant would assess overdraft fees at authorization, its practice of implementing fees on transactions that were authorized with a positive available balance is in breach of the contract. (*Id.* at 15–16.) She contends that since the funds are held at authorization, "[t]here are always sufficient funds to cover the transaction and so it cannot validly incur an [overdraft] fee." (*Id.* at 16.) She points out that the contract says many times that overdraft fees are determined using the available balance. (*Id.*) Plaintiff claims that because of these representations, consumers reasonably believe that transactions authorized on a positive balance will not be charged an overdraft fee. (*Id.* at 17–18.)

Next, Plaintiff argues that the terms "pay" and "presented" are ambiguous and "reasonably refer to authorization." (*Id.* at 19.) Again, Plaintiff claims that reasonable consumers expect that "payment" happens when they use their debit card. (*Id.* at 19–20.) Plaintiff reiterates that because funds are placed on hold at authorization, there are always sufficient funds for transactions authorized on a positive available balance. (*Id.* at 20.)

Plaintiff says that since she has stated a claim for breach of contract, her breach of the covenant of good faith and fair dealing claim should also survive the *Motion to Dismiss*. (*Id.* at 23.)

c.  Defendant's Reply (Doc. 50)

Defendant begins its reply by asserting that the Court should disregard the case law cited by Plaintiff in her *Opposition* because the rulings are from trial courts around the country dealing with cases that had different contract language at issue. (Doc. 50 at 3–4.)

Next, Defendant argues that Plaintiff does not address the actual terms of the contract, which it says clearly state the overdraft practices of Defendant. (*Id.* at 4–5.) It argues that Plaintiff ignores the plain meaning of the words in the contract, which indicate that intervening transactions can cause a transaction that was authorized with a positive balance to settle with a negative balance, thus incurring a fee. (*Id.* at 5.) In response to Plaintiff's argument that held funds are added back to the available balance before settlement only when the held amount is different than the settlement amount, Defendant asserts that the language is not restricted to only apply to situations where the hold is different than the settlement amount. (*Id.* at 5–6.)

Defendant points to Louisiana contract interpretation law to support its notion that "authorize and pay" refer to two distinct points in time. (*Id.* at 6.) It argues that if the two were to be interpreted to mean the same time, then the phrase would be superfluous. (*Id.*) Defendant insists that these terms should be read in light of the entire contract, which indicates that authorization and payment happen at different times. (*Id.* at 6–7 (quoting Doc 30-1 at 4).) It contends that there is no provision in the contract that indicates that held funds are only to be used to pay the specific transaction. (*Id.* at 8.) The provision that says that held funds are added to the available balance before settlement shows that those funds are not sequestered for payment. (*Id.*)

### 3.  Law and Analysis

This case, as pointed out by both parties, is one that deals with a relatively new issue. The transactions at issue in this case, "Authorize Positive, Settle Negative" transactions that were

13

assessed overdraft fees, have been challenged in several trial courts around the country. As of this writing, there is no case with precedential authority that directly deals with this issue. Both parties cited many cases, not all of them relevant, but, in any event, they are simply persuasive authority. Louisiana law governs this contract; thus, the contract interpretation principles used in the other cases may differ. Because Louisiana uses a civil law system, its courts look to statutes and code articles before looking to cases. *Jorge-Chevelas v. Louisiana Farm Bureau Cas. Ins. Co.*, 917 F. 34 847, 851 (5th Cir. 2019). There must be a long line of intermediate court rulings to be binding *jurisprudence constante. Id.* There is no such line of cases on this issue. The two Louisiana trial court decisions cited by Plaintiff do not include a discussion of the contract language and, thus, cannot provide the Court binding authority on how Louisiana courts would decide the case. While there are several federal district court cases that the parties cite, they do not all follow a pattern. Finding no binding precedent on this particular issue, the Court will evaluate the claims using a standard Louisiana breach of contract analysis.

a. Louisiana Contract Law in General

Although this case is before this Court due to the federal claim asserted, the Court will apply state substantive law to the state law claims. 28 U.S.C. § 1652. "When adjudicating claims for which state law provides the rules of decision, we are bound to apply the law as interpreted by the state's highest court." *Barfield v. Madison Cnty., Miss.*, 212 F.3d 269, 271–72 (5th Cir. 2000) (citing *Transcon. Gas v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992)).

Generally, to recover for breach of contract in Louisiana, a plaintiff must prove the following elements: "(1) the obligor's undertaking an obligation to perform; (2) the obligor failed to perform the obligation (the breach); and (3) the failure to perform resulted in damages to the obligee." *Deep S. Commc'ns, LLC v. Fellegy*, No. 22-598, --- F. Supp. 3d ---, 2023 WL 2529554,

at *16 (M.D. La. Jan. 23, 2023) (deGravelles, J.) (quoting *RAMJ Constr., L.L.C. v. Seola Enters., Inc.*, No. 17-01789, 2018 WL 3232781, at *2 (M.D. La. July 2, 2018) (quoting *Denham Homes, L.L.C. v. Teche Fed. Bank*, 2014-1576 (La. App. 1 Cir. 9/18/15), 182 So. 3d 108, 119) (citing La. Civ. Code art. 1994))).

The parties here disagree as to the terms of the obligation, and whether the Defendant breached the contract turns on the interpretation of those terms. "The Louisiana Civil Code provides that '[i]nterpretation of a contract is the determination of the common intent of the parties.' " *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007) (quoting La. Civ. Code art. 2045). "The words of a contract must be given their generally prevailing meaning." *Id.* at 207 (quoting La. Civ. Code art. 2047). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." *Id.* (quoting La. Civ. Code art. 2046). "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050. "A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." La. Civ. Code art. 2049.

b.  Analysis

The contract that the parties entered into included the Membership Agreement, Opt-In form, and Overdraft Disclosure. These were attached to the *Complaint* and can be considered on a Motion to Dismiss. *Inclusive Cmtys. Project, Inc.*, 920 F.3d at 900. The information in the Opt-In form and the Overdraft Disclosure must be construed together with the Membership Agreement because they were given to the Plaintiff at the same time as part of her agreement with Defendant

to open a bank account. The Membership Agreement includes reference to the Opt-In form and

the Overdraft Disclosure:

> By signing an Account Card or authenticating your request [for application], each
> of you, jointly and severally, agree to the terms and conditions in this Agreement,
> and any Account Card, Funds Availability Policy Disclosure, Truth-in-Savings
> Disclosure, Electronic Fund Transfers Agreement and Disclosure, Privacy
> Disclosure, or Account Receipt accompanying this Agreement . . . .

(Doc. 30-1 at 1). The Opt-In form and the Overdraft Disclosure are Truth-In-Savings Disclosures,

as they are mandated by Regulation E of TISA. Since the Membership Agreement references the

other two documents and they were provided to Plaintiff at the same time, their terms must be

construed in light of each other. *See Reliance Ins. Co. v. Orleans Par. Sch. Bd.*, 322 F. 2d 803 (5th

Cir. 1963).

Plaintiff's argument is essentially that the terms in the contract indicated that "Authorize

Positive, Settle Negative" transactions were not subject to overdraft fees. (Doc. 27 at 7–8.)

According to her *Complaint*, the contract only allowed Defendant to assess overdraft fees at

authorization, not final payment, meaning that "Authorize Positive, Settle Negative" transactions

could not be subject to overdraft fees. (*Id.* at 20.) These claims hinge on the interpretation of the

language in the contract, specifically the phrase "authorize and pay."

As Plaintiff points out, "authorize and pay" are used together many times in the

Membership Agreement. (*Id.* at 9.) Plaintiff claims this means that these actions take place at the

same time. (*Id.*) Plaintiff's interpretation, however, is not supported by the language of the

Membership Agreement's Paragraph 14(b) which states:

> Merchants may seek authorization for [signature-based debit card purchase]
> transactions. The authorization request places a hold on funds in your account when
> the authorization is completed. The "authorization hold" will reduce your available
> balance by the amount authorized but will not affect your actual balance. The
> transaction is subsequently processed by the merchant and submitted to us for
> payment. This can happen hours or sometimes days after the transaction, depending

16

on the payment processor. These payment requests are received in real time throughout the day and are posted to your account when they are received.

(Doc. 30-1 at 4.) By separating the acts of an authorization hold being placed and payment to the merchant, the Membership Agreement indicates that authorization and payment are distinct actions separated by time. While payment may happen soon after authorization, the two are not simultaneous events.

Plaintiff also claims that "Authorize Positive, Settle Negative" transactions do not overdraw the account because money was put on hold at the time of authorization. (Doc. 27 at 4.) This, however, is directly contradicted by the Overdraft Disclosure. This form states, in relevant part:

> Pelican State Credit Union will place a hold on your account for any authorized debit card transaction until the transaction settles (usually within two business days) or as permitted by payment system rules. In some cases, the hold may exceed the amount of the transaction. **When the hold ends, the funds will be added to the Available Balance in your account. If your account is overdrawn after the held funds are added to the available balance and the transaction is posted to the available balance, an Overdraft Fee may be assessed.**

(Doc. 30-3 at 2 (emphasis added).)

This provision clearly states the practices of Defendant. Before paying a merchant, Defendant adds the held amount back to the available balance. (*Id.*) It is only after the transaction is paid to the merchant that an overdraft fee determination is made. (*Id.*) This statement is clear, and the only reasonable interpretation is that the bank does not assess an overdraft fee until the merchant is paid. Because the contract must be construed together to determine the meaning of words and provisions, even if the Membership Agreement was ambiguous as to when overdraft fees were assessed, the provision in the Overdraft Disclosure (that was given to Plaintiff when she signed the Membership Agreement) clarifies that ambiguity.

17

In sum, the Court finds that Plaintiff has failed to plead a plausible breach of contract claim; when read as a whole, the agreement is clear and unambiguous, and Defendant did not violate its terms. Additionally, there can be no breach of the covenant of good faith and fair dealing if the parties did not breach the contract. *Favrot*, 68 So. 3d at 1110. Thus, Plaintiff's entire breach of contract claim, including her breach of the covenant of good faith and fair dealing claim, is dismissed.

### C.  Unjust Enrichment Claim

Defendant argues that because the parties have an express contract, Plaintiff is barred from recovering for unjust enrichment. (Doc. 40-1 at 26.) Further, Plaintiff has not alleged any facts that would call into question the existence or validity of the contract. (*Id.* 26–27.)

Unjust enrichment is governed by Louisiana Civil Code Article 2298. This article provides in relevant part:

> A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.

La. Civ. Code art. 2298. The Louisiana Supreme Court has articulated five elements that must be met in an unjust enrichment claim:

> (1) there must be an enrichment, (2) there must be an impoverishment, (3) there must be a connection between the enrichment and resulting impoverishment, (4) there must be an absence of "justification" or "cause" for the enrichment and impoverishment, and finally (5) the action will only be allowed when there is no other remedy at law, i.e., the action is subsidiary or corrective in nature.

*Minyard v. Curtis Prods., Inc.*, 205 So. 2d 422, 432 (La. 1968). The fifth element, that there be no other remedy at law, is at issue in this case.

Generally, the existence of other available claims precludes recovery for unjust enrichment. *Liberty Mut. Fire Ins. Co. v. Shaw Grp., Inc.*, No. 20-871, 2022 WL 896804 at *23 (M.D. La. Mar. 25, 2022) (deGravelles, J.) (citations omitted). This does not mean, however, that unjust enrichment may never be pled alongside other claims. *Id.* at *24. This Court in *Liberty Mutual* held that a plaintiff may bring an unjust enrichment claim as an alternative claim when the validity or existence of the contract is in question. *Id.*

Here, Plaintiff pleads unjust enrichment in the alternative "if the parties' contracts are deemed unconscionable or otherwise unenforceable for any reason." (Doc. 27 at 24.) A contract can be deemed to be unconscionable when the contract lacks free consent. *Lafleur v. Law Offs. of Anthony G. Buzbee, P.C.*, No. 2006-0466 (La. App. 1 Cir. 3/23/07), 960 So. 2d 105, 112 (citing *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159, 167 (5th Cir. 2004)). "A contract is formed by the consent of the parties established through offer and acceptance." La. Civ. Code art. 1927. The vices of consent are error, fraud, and duress. La. Civ. Code art. 1948.

Plaintiff has not alleged any facts in the operative complaint that would give notice to an error, fraud, or duress claim. She only claims that Defendant did not follow the terms of the agreement. (Doc. 27.) She does not explain why the contract would be unconscionable or unenforceable. (*Id.* at 23–24.) Since Plaintiff has failed to plead that the contract was invalid, she cannot plead unjust enrichment in the alternative. Thus, this claim will be dismissed.

### D.  Regulation E Claim

#### 1.  *Parties' Arguments*

##### a.  Defendant's Memorandum in Support (Doc. 40-1)

Defendant argues that Plaintiff has also failed to state a claim for the Regulation E violation. (Doc. 40-1 at 23.) Defendant claims that Plaintiff has not alleged how Defendant failed to comply with Regulation E, and the terms of the agreement are sufficient under Regulation E. (*Id.*)

Defendant further asserts that its Membership Agreement, when read in conjunction with the Opt-In Form and the Overdraft Disclosure, accurately describes its overdraft practices. (*Id.* at 13.) It argues that the documents must be read together because they were "executed by the same parties substantially at the same time and relating to the same subject-matter." (*Id.* at 24.) Defendant claims that Plaintiff was given all three documents when she opened her account and she agreed to each one. (*Id.* at 25.)

Defendant argues that it is covered by the safe harbor provision of the Electronic Fund Transfer Act ("EFTA"), which protects federally insured credit unions from liability for any act that is done to conform with an EFTA rule or a failure to disclose in proper form, if the institution used a model clause provided by the Bureau or Board. (*Id.* at 14 (quoting 15 U.S.C. § 1693m(d)).) Defendant claims that it is covered by this safe harbor provision because its Opt-In form is "a near-verbatim copy of Model Form A-9." (*Id.*)

##### b.  Plaintiff's Opposition (Doc. 44)

Plaintiff argues that Defendant has violated Regulation E because its Opt-In form does not accurately describe Defendant's overdraft practices. (Doc. 44 at 23–24.) Plaintiff asserts that the Opt-In form is silent on how Defendant determines whether there is enough money to cover a

transaction. (*Id.* at 24.) Plaintiff points to the use of the phrase "authorize and pay," which she claims refers to the time of authorization, to say that this assertion in the contract is at odds with what Defendant actually does, determining overdraft at the time of settlement. (*Id.* at 25.)

Plaintiff claims that the Opt-In form should not be construed with the Overdraft Disclosure or the Membership Agreement because Regulation E requires the Opt-In form to be " ' segregated from all other information' " (*Id.* at 26.) Plaintiff argues that the safe harbor provision of the EFTA is inapplicable because the safe harbor is limited to cases where financial institutions fail to make disclosures in proper form. (*Id.*) She states that since her claim is that Defendant did not accurately disclose its overdraft services, the Regulation E claim is substantive and, thus, not barred by the EFTA safe harbor provision. (*Id.* at 26–27.) Plaintiff asserts that even if the safe harbor provision could apply here, Defendant still would not be covered because financial institutions must make sure that the form that they use, based on Model Form A-9, is tailored to their overdraft procedures, which Defendant did not do. (*Id.* at 27.)

### c.   Defendant's Reply (Doc. 50)

Defendant asserts that Plaintiff laid out facts in her *Opposition* which purport to support her Regulation E claim. (Doc. 50 at 8.) However, argues Defendant, such allegations are not enough to plead a viable Regulation E claim, and, thus, Plaintiff's *Complaint* fails in this respect. (*Id.*) Further, Defendant asserts that it complied with Regulation E because the Opt-In form and the Overdraft Disclosure may be read together. (*Id.* at 9.) Defendant argues that the "segregation" requirement of Regulation E was imposed to protect consumers from opt-in provisions being hidden in the rest of an account agreement. (*Id.* (quoting 74 Fed. Reg. at 59041).)  Thus, since the Opt-In form and the Overdraft Disclosure were separate documents given to Plaintiff, they satisfy Regulation E and may be read together. (*Id.* at 9–10.)

### 2. *Law and Analysis*

12 C.F.R. § 1005 (Regulation E)

> carries out the purposes of the Electronic Fund Transfer Act, which establishes the basic rights, liabilities, and responsibilities . . . of financial institutions or other persons that offer [electronic fund transfer and remittance transfer] services. The primary objective of the act and this part is the protection of individual consumers engaging in electronic fund transfers and remittance transfers.

12 C.F.R. § 1005.1(b). Among these responsibilities is an opt-in requirement for overdraft services. Financial institutions are required to get affirmative consent from the consumer to assess overdraft fees on ATM or one-time debit card transactions. *Id.* § 1005.17(b). Section 1005.17 includes a reference to Model Form A-9, which is a model opt-in form that financial institutions can use. This form includes all the form requirements of § 1005.17(d), and all opt-in forms must be substantially similar to it. *Id.* § 1005.17(d).

The Opt-In form used by Defendant is nearly identical to Model Form A-9. (*See* Doc. 30-3; 12 C.F.R. § 1005 App'x A-9.) The only difference between the two is that Defendant does not offer overdraft services for ATM transactions, which is not at issue here.

Plaintiff claims that Defendant has violated Regulation E because it did not accurately disclose its overdraft practices. (Doc. 27 at 22–23.) She says that because of the requirement that the Opt-In form be segregated from the rest of the contract, it cannot be read in conjunction with the Overdraft Disclosure, which more fully explains the overdraft practices. (Doc. 44 at 26.)

The Opt-In requirement in § 1005.17(b) requires that the financial institution "provide[ ] the consumer with a notice in writing, or if the customer agrees, electronically, segregated from all other information, describing the institution's overdraft service." 12 C.F.R. § 1005.17(b)(1)(i). While there is no binding precedent on whether an Opt-In form may be construed with other documents provided at the time of signing, federal district courts have said that the segregation

requirement means that an Opt-In form should be considered, for a Regulation E claim, on its own. *See Ramirez v. Baxter Credit Union*, No. 16-3765, 2017 WL 118859 (N.D. Cal. Jan. 12, 2017); *Adams v. Liberty Bank*, No. 20-1601, 2021 WL 3726007 (D. Conn. Aug. 23, 2021); *Wellington v. Empower Fed. Credit Union*, 533 F. Supp. 3d 64 (N.D. N.Y. 2021); *Grenier v. Granite State Credit Union*, 570 F. Supp. 3d 18, 22 (D. N.H. 2021). This Court agrees.

While Defendant is correct in arguing that this protection keeps consumers from parsing through a contract to find the overdraft fee terms, there are more interests to be considered. A form that is segregated from all others with no explanation about the terms contained within can be just as harmful to consumers as burying the Opt-In notice in the middle of a larger contract. With no explanation in the Opt-In form, the consumer is left to sift through the main agreement to find what the terms mean. As the segregation provision of Regulation E has been put in place to protect consumers, it should be interpreted to require complete segregation from all other forms when evaluating a Regulation E violation. Thus, the Court will only decide this issue based on the Opt-In form itself.

Plaintiff claims that the Opt-In form is not consistent with Defendant's actions because the language of the Opt-In form indicates that overdraft fees are assessed at authorization. (Doc. 27 at 9–10.) She argues that since Defendant assesses fees later, when transactions are posted, Defendant is in violation of Regulation E. (*Id.* at 23.)[1]

Defendant counters that it is covered by the safe harbor provision of Regulation E and, thus, cannot be found liable. (Doc. 40-1 at 14.) A safe harbor for following the model forms given in Regulation E is provided for in 15 U.S.C. § 1693m(d)(2). This section provides protection from liability for "any failure to make disclosure in proper form if a financial institution utilized an

---

[1] While Plaintiff does not state this directly, the allegations in the complaint are construed in a light most favorable to the Plaintiff. *See In re Great Lakes Dredge*, 624 F.3d 201.

appropriate model clause issued by the Bureau or the Board." Defendant claims that since its Opt-In form is substantively identical to Model Form A-9, it is covered by the safe harbor provision. (Doc. 40-1 at 14.)

The safe harbor provision is described in the Official Interpretations Section of 12 C.F.R. § 1005: "If an institution uses these clauses *accurately* to reflect its service, the institution is protected from liability for failure to make disclosures in proper form." 12 C.F.R. § 1005, Supp. I, App'x A (1) (emphasis added). This statement, along with the text of the regulation referring only to the form that the disclosure must be in, indicates that the safe harbor provision of Regulation E only applies to claims that an improper form was used to disclose practices, not that the Opt-In form inaccurately represented the overdraft practices of the institution.

Here, Plaintiff's Regulation E claim is that Defendant did not follow the terms of the Opt-In agreement and misrepresented its overdraft fee practice. This does not fall within the purview of the safe harbor provision and so Defendant is not insulated from liability.

The Court finds that Plaintiff has stated enough facts to state a claim for a Regulation E violation. As Plaintiff alleges, the terms of the Opt-In form do not state the time when overdraft fees are assessed. (Doc. 30-2.) The Opt-In form also does not distinguish between the terms "authorize" and "pay" and does not indicate that these actions are separate points in time. (*Id.*) Without the substance of the Membership Agreement and Overdraft Disclosure to consider, there is ambiguity as to the process that Defendant uses. Because of this ambiguity, it is plausible, assuming that the allegations in the *Complaint* are true, that Defendant violated Regulation E. Thus, the Regulation E claim will not be dismissed, and Defendant's *Motion* is denied with respect to this issue.

## IV.    LEAVE TO AMEND

"Federal Rules of Civil Procedure 15(a) 'requires the trial court to grant leave to amend

freely,' further 'the language of this rule evinces a bias in favor of granting leave to amend.' "

*Certain Underwriters at Llyod's London v. Apollo Energy, LLC*, 387 F. Supp. 3d 663, 678 (M.D.

La. 2019) (deGravelles, J.) (citing *Jones v. Robinson Prop. Grp., LP*, 427 F.3d 987, 994 (5th Cir.

2014)).   "A court ordinarily should not dismiss the complaint except after affording every

opportunity to the plaintiff to state a claim upon which relief might be granted." *Byrd v. Bates*, 220

F. 2d 480, 482 (5th Cir. 1995). In *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,

the court stated:

> In view of the consequences of dismissal on the complaint alone, and the pull to
> decide cases on the merits rather than on the sufficiency of pleadings, district courts
> often afford plaintiffs at least one opportunity to cure pleading deficiencies before
> dismissing a case, unless it is clear that the defects are incurable or the plaintiffs
> advise the court that they are unwilling or unable to amend in a manner that will
> avoid dismissal.

313 F.3d 305, 329 (5th Cir. 2002). Further:

> As the numerous case[s] . . . make clear, dismissal under Rule 12(b)(6) generally is
> not immediately final or on the merits because the district court normally will give
> the plaintiff leave to file an amended complaint to see if the shortcomings of the
> original document can be corrected. The federal rule policy of deciding cases on
> the basis of the substantive rights involved rather than on technicalities requires that
> the plaintiff be given every opportunity to cure a formal defect in the pleading. This
> is true even when the district judge doubts that the plaintiff will be able to overcome
> the shortcomings in the initial pleading. Thus, the cases make it clear that leave to
> amend the complaint should be refused only if it appears to a certainty that the
> plaintiff cannot state a claim. A district court's refusal to allow leave to amend is
> reviewed for abuse of discretion by the court of appeals. A wise judicial practice
> (and one that is commonly followed) would be to allow at least one amendment
> regardless of how unpromising the initial pleading appears because except in
> unusual circumstances it is unlikely that the district court will be able to determine
> conclusively on the face of a defective pleading whether the plaintiff actually can
> state a claim for relief.

*JMCB, LLC v. Bd. of Com. & Indus.*, 336 F. Supp. 3d 620, 642 (M.D. La. Aug. 23, 2018) (deGravelles, J.) (quoting 5b Charles A. Wright, Arthur R. Miller, et. al., *Federal Practice and Procedure* § 1357 (3d ed. 2016)).

Plaintiff has not pled sufficient facts to show that Defendant breached its contract with her. When all the terms of the contract are read together, Plaintiff has failed to state a claim for breach. However, Plaintiff has only amended her *Complaint* once before, and this amendment was not in response to a judicial order. Although it is unclear to the Court how Plaintiff would be able to cure the deficiencies outlined above, the Court, in accordance with "wise judicial practice," will allow Plaintiff to amend her *Complaint*. *See Watkins v. Gautreaux*, 515 F. Supp. 3d 500, 519 (M.D. La. 2021) (deGravelles, J.) (citing, *inter alia*, *Fetty v. La. State Bd. Of Private Sec. Exam'rs*, No. 18-517, 2020 WL 520026 at *15 (M.D. La. Jan. 31, 2020) (deGravelles, J.)). However, Plaintiff is reminded of her obligations under Federal Rule of Civil Procedure 11.

## V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Motion to Dismiss* (Doc. 40) filed by PELICAN STATE CREDIT UNION is **GRANTED IN PART** and **DENIED IN PART**. With respect to Defendant's *Motion to Dismiss* Plaintiff's Regulation E claim and Defendant's federal preemption argument, the *Motion* is **DENIED**. With respect to Defendant's *Motion to Dismiss* all other claims, the *Motion* is **GRANTED**, and Plaintiff's breach of contract and unjust enrichment claims are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiff shall have twenty-eight (28) days from the Court's ruling on Defendant's *Motion to Dismiss* (Doc. 40) in which to cure the above deficiencies. If Plaintiff fails to do so, Plaintiff's breach of contract and unjust enrichment claims against Defendant will be dismissed with prejudice.

Signed in Baton Rouge, Louisiana, on <u>September 21, 2023</u>.

 

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**